UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

---------------------------------------------------------------x
MICHAEL WARREN and CLAYTON         )
SIMMMONS, individually and on behalf of a class )
of similarly situated individuals,                )
                                   )
            Plaintiffs,            )    No. 6:07-CV-2043-ORL-22-DAB
                                   )
        v.                         )
                                   )
OPENMARKET, INC., a Michigan Corporation,   )
VERISIGN, INC., a Delaware corporation, and )
M-QUBE, INC., a Delaware Corporation,       )
                                   )
            Defendants.            )
---------------------------------------------------------------x

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Michael Warren and Clayton Simmons bring this class action complaint against OpenMarket, Inc. ("OpenMarket"), VeriSign, Inc. ("VeriSign") and m-Qube, Inc. ("m-Qube") (collectively, "Defendants") seeking to stop Defendants' unlawful practice of charging cellular telephone customers for products and services the customers have not authorized, a practice which has resulted in Defendants unlawfully collecting money from consumers statewide, and to obtain redress for all persons injured by their conduct. Plaintiffs, for their class action complaint, allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

### NATURE OF THE ACTION

1.   This case arises from two closely related phenomena. The first is the capability of most cellular telephones, not only to make and receive telephone calls, but also to send and

receive text messages, including -- most significantly for present purposes -- "premium" text message services. These services, also known as "mobile content" include products that range from the basic (customized ringtones for use with cell phones, sports score reports, weather alerts, stock tips, horoscope services, and the like) to those requiring more advanced capabilities (such as direct payment services, interactive radio and participatory television).

2. The second underlying phenomenon of this case constitutes its very core. That is, just as providers of premium mobile content deliver their products by means of cell phone technology, they likewise charge and collect from their customers by "piggybacking" on the cell phone bills sent out by the wireless carriers. Further, because the mobile content providers by themselves most often lack the wherewithal to negotiate the necessary relationships with the much larger wireless carriers, they do so with the help of third-party companies, such as Defendants, known as aggregators. These aggregators act as middle-men, representing numerous mobile content providers in arriving at the agreements that allow them to use the billing and collection mechanisms of the wireless carriers. In turn, both the aggregators and the wireless carriers are compensated for their services to the mobile content providers by retaining a substantial percentage of the amount each premium mobile content transaction.

3. The rapid and largely unplanned growth of the premium mobile content industry has led both to the above-described structure and to a disastrous flaw within it. That flaw -- understood, perpetuated, and even encouraged by carriers, aggregators, and mobile content providers such as the instant defendants -- is an open secret within the industry, but little understood outside of it. In short, the billing and collection systems established by companies including Defendants in aid of the premium mobile content industry that enriches them are

conspicuously free of any checks or safeguards to prevent erroneous and unauthorized charges from being added to customers' bills.

4. As Defendants also know, significant amounts of money have been collected on account of such unauthorized charges for premium mobile content in the industry over the last few years. And while it has always been within the power of companies such as Defendants to institute simple and effective measures that would prevent this, they have instead knowingly maintained the very system that has allowed these erroneous charges. Indeed Defendants have reaped and retained their respective shares of the improper collections.

## JURISDICTION

6. This Court has jurisdiction because Plaintiffs have brought Federal claims pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq., ("CFAA") and 28 U.S.C. § 1331.

7. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because they arise out of the same common nucleus of operative fact as Plaintiffs' federal claims, and would ordinarily be expected to be tried in one judicial proceeding.

## VENUE

8. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2).

## PARTIES

9. Plaintiff Warren is a resident of Florida.

10. Plaintiff Simmons is a resident of Florida.

11. Defendant OpenMarket, Inc. ("OpenMarket"), is an aggregator and operates a mobile transaction network that processes mobile payments on its behalf and on behalf of carriers and third party mobile content providers. OpenMarket is a Michigan corporation with its

3

headquarters and principal place of business in the State of Washington. OpenMarket does business throughout the United States, including the State of Florida and this District.

12. Defendant m-Qube, Inc. ("m-Qube"), a self-proclaimed "leading mobile channel enabler," is an "aggregator" and operates a mobile transaction network that processes mobile payments on its behalf and on behalf of carriers, other aggregators and third party mobile content providers. m-Qube is a Delaware corporation with its headquarters and principal place of business in the State of California. m-Qube does business throughout the United States, including the State of Florida and this District.

13. Defendant VeriSign, Inc. ("VeriSign") is an aggregator with a self-proclaimed "market-leading portfolio of managed communications and content offerings" whose operations have become essentially merged with those of its subsidiary m-Qube. In May 2006, VeriSign acquired m-Qube and has since integrated and operated many of m-Qube's aggregator systems including, but not limited to, those processing communications and/or mobile content charges that are the subject of this suit. VeriSign is a Delaware corporation with its headquarters and principal place of business in the State of California. VeriSign does business throughout the State of Florida and this District.

## CONDUCT COMPLAINED OF

14. While the total sales in Florida of premium mobile content in 2007 amount to a significant sum, the business is still in its infancy. The burgeoning mobile content industry has already expanded from ordinary ringtones into mass media-related products such as interactive radio and participatory voting at television and concert events and, most recently, into services that enable cell phones to function as credit cards. Unchecked, Defendants' practices will injure an ever-increasing number of unwitting consumers, inflicting damages of an untold magnitude.

15.     Unlike transactions made using checks and credit cards, which require a signature or a highly private sixteen-digit credit card number, the only thing a mobile content provider needs to charge a consumer for its products is the consumer's cellular telephone number. Once a mobile content provider has a consumer's cell phone number, it can cause that consumer to be billed for services and products irrespective of whether the consumer actually agreed to purchase them.

16.     Armed with only a cell phone number, the mobile content provider can simply provide that number, along with an amount to be charged, to a billing aggregator (such as OpenMarket). The aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill associated with that cell phone number. The charge will then appear on the consumer's cell phone bill, often with only minimal, cryptic identifying information.

17.     Because the protections normally present in consumer transactions -- such as signatures and private credit card numbers -- are absent from this process, the likelihood of false charges increases enormously. And because a substantial part of mobile content "sales" are effected through web sites using misleading, oblique, or inadequately explained "consent" procedures, that likelihood increases by another order of magnitude. Mobile content providers have powerful financial incentives to collect as many cell phone numbers as possible but little incentive to ensure that the owners of those numbers have truly agreed to purchase their goods and services.

### Aggregators' Role In the Scheme to Defraud

18.     In order to tap into the emerging wireless content marketplace and make content services available to wireless consumers, content providers must first obtain access to wireless carriers' mobile communications networks and frequently do so by "partnering" with

aggregators -- intermediary companies such as OpenMarket that offer content providers (its "content provider partners") direct access to the carriers through existing relationships. This allows content providers to focus on developing and marketing branded content, applications and programs while aggregators manage the complex carrier relationships, distribution, billing and customer service.

19. As aggregators, Defendants operate mobile transaction networks that helps companies develop, deliver, and bill for mobile content services to compatible mobile devices throughout the State of Florida and the nation.

20. By using their end-to-end technology platforms, their relationships with U.S. carriers, and other value-added services, these aggregators have forged a crucial link between the wireless carriers and the mobile content providers. They have enabled the transformation of wireless into a marketing, content delivery, and collections process, while carving out a profitable role for themselves as very critical middlemen in this rapidly growing industry.

21. Defendants have developed vast distribution systems that integrate into the wireless networks of some of the largest wireless carriers nationwide, providing direct connections to more than 500 mobile operators, including AT&T, Cellular One, AT&T Nextel, Alltel, US Cellular, among many others. As a result, Defendants are able to reach and bill wireless subscribers nationwide.

22. While aggregators charge their content provider customers some upfront fees, their revenue is primarily generated through a "revenue share" on transactions for which they bill cell phone subscribers: each time a charge is incurred in connection with the purchase of mobile content services offered by a content provider, the aggregator and/or the content provider cause

said charge to be billed directly on the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

23. The carrier then bills and collects the charge from its current subscriber, retains about a portion of the proceeds as its "revenue share" and then remits the balance to the aggregator who has direct access to its network, e.g., m-Qube, who retains a percentage of the balance in the form of its own "revenue share," and then remits the remainder directly to the mobile content provider (or, in some instances, to another aggregator who then retains a percentage of the balance in the form of its own "revenue share" and then remits the balance to its mobile content provider client).

24. Defendants have in Florida registered numerous transactions and processed significant amounts of money in transactions over recent years and have profited greatly from their arrangement with their carrier partners, aggregator partners and content provider partners.

25. As Defendants know, carriers such as AT&T, Verizon, Sprint and T-Mobile, among others, routinely process charges for mobile content that have not been authorized by the charged party.

26. Defendants have not only sanctioned this illegal billing, they have promoted it by negotiating and facilitating partnerships between the carriers and the mobile-content providers that contain few if any safeguards to prevent unauthorized charges.

27. Indeed, if Defendants wanted to end this illegal billing, they could do so in an instant. All they would have to do to ensure that they are obtaining the consent of the charged party is agree to process a unique "access code" for each customer account, provided by the carrier to the account holder and his/her authorized representatives at the time it is opened, and

require that it be produced anytime a third-party attempts to charge the account. If a matching access code is not provided, no charges would be included on the customer's billing statement.

28. But instead of implementing such a simple safeguard, Defendants have intentionally created and maintained a system that encourages fraud at every step. Because the amount Defendants are taking is small on an individual basis – as little as $1 or less to at most several hundred dollars per person -- Defendants employ this scheme with the hope and expectation that their illegal conduct will go unpunished.

## THE FACTS RELATING TO THE NAMED PLAINTIFF WARREN

29. In or about 2004, Plaintiff purchased new cell phone service for his personal use from an authorized AT&T sales representative.

30. On that same day, in exchange for a AT&T cell phone service plan, Plaintiff agreed to pay a specific amount each month for a period of about 12 months.

31. Upon activating his cellular telephone account, AT&T provided Plaintiff a cellular telephone number.

32. Beginning in or about November 2007 and continuing through December 2007, Plaintiff's cell phone account was charged for multiple unwanted mobile content services in the form of "premium" text messages from Defendants VeriSign and/or m-Qube.

33. At no time did Plaintiff authorize the purchase of products and services for which he was billed by Defendants.

34. During the relevant time period, Defendants caused Plaintiff to be charged service fees of various amounts for so-called "Premium" text messages provided by Defendants.

35. At no time did Plaintiff authorize Defendants or anyone else to bill him for these charges.

36.     At no time did Defendants verify Plaintiff's purported authorization of these charges and no time did Defendants provide a complete refund consisting of the premium text message charges, ordinary text messages, data charges and/or back interest. Nor did Defendants provide Plaintiff an assurance that such unauthorized charges would not appear in future billing periods.

## THE FACTS RELATING TO THE NAMED PLAINTIFF SIMMONS

37.     Several years ago, Plaintiff purchased new cell phone service for his family's personal use from an authorized AT&T sales representative.

38.     On that same day, in exchange for an AT&T cell phone service plan, Plaintiff agreed to pay a specific amount each month for a period of about 12 months.

39.     Upon activating his cellular telephone account, AT&T provided Plaintiff a cellular telephone number.

40.     Beginning on or about April, 2007 and continuing through about October, 2007, Plaintiff's cell phone account was charged for multiple unwanted mobile content services in the form of "premium" text messages from Defendants.

41.     At no time did Plaintiff authorize the purchase of these products and services offered by Defendants and at no time did Plaintiff consent to their sending of text messages to his cellular telephone.

42.     During the relevant time period, Defendants caused Plaintiff to be charged service fees of various amounts for so-called "Premium" text messages provided by Defendants.

43.     At no time did Plaintiff authorize Defendants or anyone else to bill him for these charges.

44. At no time did Defendants verify Plaintiff's purported authorization of these charges and no time did Defendants provide a complete refund consisting of the premium text message charges, ordinary text messages, data charges and/or back interest. Nor did Defendants provide Plaintiff an assurance that such unauthorized charges would not appear in future billing periods.

## CLASS ACTION ALLEGATIONS

45. Plaintiffs bring this action on behalf of themselves and a class (the "Class") consisting of all wireless telephone subscribers in Florida who suffered losses or damages as a result of incurring charges on their cellular telephone bills from or on behalf of m-Qube, VeriSign and/or OpenMarket not authorized by the subscriber; provided, however, that the following are excluded from this proposed Class: (i) the defendants, and (ii) any employee of a defendant.

46. The claims of Plaintiffs are typical of the claims of all of the other members of the Class.

47. Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class, and have the financial resources to do so. Neither Plaintiff nor their counsel has any interest adverse to those of the other members of the Class. Further, Plaintiffs will donate any proceeds received from this lawsuit to an independent charity.

48. Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive, and will have no effective remedy. The class treatment of

common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

49.     Defendants have acted and failed to act on grounds generally applicable to the plaintiff and the other members of the respective Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class.

50.     The factual and legal bases of Defendants' liability to Plaintiffs and to the other members of the Class are the same, resulting in injury to the Plaintiffs and to all of the other members of the Class. Plaintiffs and the other Class members have all suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

51.     There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

   (a)     Whether Defendants' conduct violated the Computer Fraud and Abuse Act;

   (b)     Whether Defendants have unjustly received money belonging to Plaintiffs and the Class and whether under principles of equity and good conscience, Defendants should not be permitted to retain it;

   (c)     Whether Defendants tortiously interfered with contracts between Plaintiffs and the Class, on the one hand, and their wireless carriers on the other hand, by causing them to be charged for products and services by their carrier that were unauthorized.

## COUNT I
### (Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq.)

52. Plaintiffs incorporate by reference the foregoing allegations.

53. The cellular phones used and owned by Plaintiffs and the other class members are sophisticated electronics equipment and contain many (if not most) of the same capabilities and equipment as traditional desktop computers, as well as cellular radio signal processing technology. These cellular phones are computers under the definition of 18 U.S.C. §1030(e)(1). Further, these cellular phones are used in interstate or foreign commerce and communication, and are protected computers under the definition of 18 U.S.C. § 1030(e)(1).

54. The delivery of SMS messages to cellular phones is performed according to industry standards (specifically, the Short Message Service standard). The technical protocols of these standards require that transmission of mobile content to a cellular telephone (and the subsequent billing of that account) is not complete until the cellular phone transmits a confirmation signal. Thus, the unauthorized charges to cellular telephone numbers attributable to Defendants require interactivity and access to the cellular phones of Plaintiffs and the other class members.

55. If the unauthorized charges to cellular telephone numbers attributable to Defendants are not eventually paid, Plaintiffs' carriers (and every other cellular carrier) would discontinue all services (including cellular service) to the affected cellular accounts. Thus, these charges impair the availability of class members' access to and communication with their cellular service, because they require class members to pay more to their cellular telephone carriers (and every other carrier) to maintain their cellular service. Consequently, these charges constitute

"damage" under the definition of 18 U.S.C. § 1030(e)(8) and payment of these charges constitutes "loss" under the definition of 18 U.S.C. §1030(e)(11).

56. The unauthorized charges alleged in this complaint have caused class members, collectively over the last year, to pay more than $5,000 in additional fees to their cellular telephone carriers to maintain their cellular service.

57. Through their conduct alleged above, Defendants are involved in the unauthorized transmission of SMS messages to the cellular phones of Plaintiffs and the other class members, and either intentionally made unauthorized access to those cellular phones or were willfully blind to the possibility that such access was unauthorized. By this conduct, Defendants violate 18 U.S.C. § 1030(a)(5)(B)(i).

58. Additionally, Defendants are involved in the transmission of mobile content to the cellular phones of Plaintiffs and the other class members and to computers maintained by cellular telephone carriers for the purpose of relaying mobile content to cellular telephone subscribers. Further, Defendants are involved in the transmission of billing information to computers maintained by such carriers for the purpose of billing cellular telephone subscribers for receipt of mobile content services. Defendants knew and intended it would cause damage to the cellular telephones of Plaintiffs and the other class members in the form of the charges alleged above, and knew and intended (or, in the alternative, were willfully blind to the fact) that such charges were not authorized. This conduct violates 18 U.S.C. § 1030(a)(5)(B)(i).

59. Plaintiffs, on their own behalf and behalf of the other class members, seek compensatory damages in an amount to be determined at trial and injunctive relief or other equitable relief (including an accounting, and disgorgement of fees obtained while the CFAA violations were ongoing), against Defendants under the CFAA (18 U.S.C. § 1030(g)).

## COUNT II
### (Restitution/Unjust Enrichment on behalf of the Class)

60. Plaintiffs incorporate by reference the foregoing allegations.

61. A benefit has been conferred upon Defendants by Plaintiffs and the Class. Defendants have received and retain money belonging to Plaintiffs and the Class resulting from their billing and collecting of significant amounts of money in unauthorized mobile content charges.

62. Defendants appreciate or have knowledge of said benefit.

63. Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and the Class which Defendants have unjustly received as a result of their actions.

## COUNT III
### (Tortious Interference with a Contract on behalf of the Class)

64. Plaintiffs incorporate by reference the foregoing allegations.

65. Plaintiffs and the Class had contractual relationships with their wireless carriers whereby they agreed to pay a certain sum of money in exchange for activation of their cellular telephone accounts and their carriers' promise to provide various communication and related services to Plaintiffs and the Class and to bill Plaintiffs and the Class only for products or services the purchase of which they had authorized.

66. Defendants knew of said contractual relationships and intended to and did induce a breach or disruption of the contractual relationships.

67. Defendants intentionally interfered with said contractual relationship through improper motives and/or means by knowingly and/or recklessly continually causing to be placed

on the cellular telephone bills of cellular telephone owners across the nation unauthorized charges.

68.   Plaintiffs and the Class suffered loss as a direct result of the conduct of Defendants.

WHEREFORE, Plaintiffs Warren and Simmons, on behalf of themselves and the Class, pray for the following relief:

    a.    Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

    b.    Declare that the actions of Defendants, as set out above, violate the Computer Fraud and Abuse Act;

    c.    Enter judgment against Defendants for all economic, monetary, actual, consequential, statutory and compensatory damages caused by its conduct, and if their conduct is proved willful, award Plaintiffs and the Class exemplary damages;

    d.    Declare that the actions of Defendants, as set out above, constitute unjust enrichment and tortious interference with a contract;

    e.    Enter judgment against Defendants for all economic, monetary, actual, consequential, and compensatory damages caused by Defendants' conduct, and if their conduct is proved willful award Plaintiffs and the Class exemplary damages;

    f.    Award Plaintiffs and the Class reasonable costs and attorneys' fees;

    g.    Award Plaintiffs and the Class pre- and post-judgment interest;

    h.    Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to protect the interests of Plaintiffs and the Class; and

    i.    Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiffs request trial by jury of all claims that can be so tried.

December 28, 2007

                Michael Warren and Clayton Simmons, individually
                and on behalf of a class of similarly situated
                individuals

                */s/ David P. Healy*

                David P. Healy (940410) — Trial Counsel
                2846-B Remington Green Cr.
                Tallahassee, FL 32308
                (850) 222-5400
                (850) 222-7339 (fax)
                dhealy@nettally.com
                One of their attorneys

Jay Edelson
Myles McGuire
John Blim (Of Counsel)
KAMBEREDELSON, LLC
53 West Jackson Boulevard
Suite 1530
Chicago, Illinois 60604
Telephone: (312) 589-6370
Of Counsel